## GALBRAITH v. RODDY et al.

Eastern Section. November 3, 1934.

Petition for Certiorari denied by Supreme Court, March 7, 1936.

Johnson, Cox & Johnson, of Knoxville, for appellants.
Ely, Buhl & Ely, of Knoxville, for appellee.

PORTRUM, J.   This case presents the question of the legality and right to enforcement of a covenant, contained in a mortgage, for the partial release of land when sold in lots or parcels. The covenant, to be hereinafter copied, provides that the mortgagee will release lots or parcels when $200 per acre of the purchase price is paid to him upon his debt.

The bill alleges that the mortgagors sold and conveyed a tract of three acres to the complainant, Charles E. Galbraith, for the recited consideration of $1 and the execution of a note payable to one of the mortgagors for the sum of $500, and that the complainant had tendered to the mortgagee, J. P. Roddy, the sum of $600 in legal tender representing $200 per acre, and had requested a release, but that the said Roddy had refused the tender and declined to make a release. The sum was tendered in the bill and paid into court, and the court was asked to construe the covenant as contained in the mortgage and enforce the covenant by a mandatory injunction or by a decree declaring the rights of the parties and releasing the lien to this tract of land.

The defendant obtained time to defend, and, the indebtedness having since defaulted, the trustee advertised the entire tract for sale under a foreclosure procedure; and then the complainant filed a supplemental and amended bill asking for an injunction restraining the trustee from selling the 3-acre tract involved in the litigation. This injunction was granted and the mortgage foreclosed with the exception of the 3-acre tract. The pleadings were then answered, denying the right of the mortgagors to carve out 3 acres from the boundary, which is alleged to be the most valuable and contained the dwelling house, and the denial calls for a construction of the instrument. The answer also contains broad allegations of fraud, but the only specific facts alleged that are pertinent to the inquiry are the facts that the tract of 3 acres was carved out of the entire boundary and is the most valuable 3 acres within the boundary, and that the purchaser of this tract is the son of Charles E. Galbraith,

one of the mortgagors, so that it is a collusive agreement between the father and son to work an injury upon the mortgagee. If the son has a legal right to make this purchase under the terms of the mortgage, then it is not fraudulent, and, if he has not this right, then it is not fraudulent, for the mortgagee was not injured. The transaction was conducted openly and without concealment. Other facts were alleged in reference to the bidding of one of the mortgagors at the foreclosure sale, when he was unable to comply with his bid, and when his bidding obstructed the sale, but these facts have no bearing upon the issues involved in this litigation, and they did not injure the mortgagee, so we will not further notice them.

We think this a fair statement of the pleadings, and they put in issue solely the construction of this instrument, to be gathered from the face of the instrument and the surrounding facts and circumstances. There is perhaps another issue raised by intendment, which is that, after a construction of the instrument, the court sees from the facts and circumstances that there was in fact no meeting of the minds, and that the contract as made was such an onerous one that a court of equity cannot in good conscience lend its aid to the enforcement of its terms.

In 1930 the mortgagors, Fred G. Denton and Charles E. Galbraith, were engaged extensively in the real estate business in the city of Knoxville and surrounding territory, and prior to that time, or in 1928, they had purchased from George Tabler and others a farm of 130 acres; a part of the consideration being deferred and secured by a vendor's lien. From this boundary of 130 acres they had sold a boundary of 6 acres, reducing the acreage in the farm to 124 acres, and against this there was a lien securing $13,000 of the purchase money. This tract of land lay to the west of the city of Knoxville and 8 miles from the courthouse; it was within 2 miles of Lyon's View, the location of a state institution within the corporate limits of Knoxville; and it also lay near the suburban development known as Westmoreland Heights. It was rolling land and traversed by three roads, and, due to its location and its topography, it was valuable for subdivision purposes, since there were many desirable building sites upon it. It was originally purchased for the purpose of subdivision and sale. In 1930 there was no demand for home sites, and the owners were being pressed upon their obligation for the payment of the purchase price, and it became necessary for them to seek a loan upon the property in order to pay the purchase price.

The defendant Mr. J. P. Roddy owned a country home situated on land adjoining this property, and for fear of building undesirable structures and filling stations upon the land, he became interested in purchasing a portion of this land adjoining his in order to add the purchased boundary to his holding. The record indicates that he was

a man of wealth; he was engaged in other productive businesses except that of farming, and he was interested in farming and he wanted to purchase this strip of land adjoining him.

The owner entered into an agreement with him to sell him this strip of land consisting of about 45 acres at the price of $250 per acre, on condition he would refinance their loan for the purchase money, or loan them $13,000 to discharge the vendor's lien, taking a mortgage upon the boundary of land as security, and upon a five-year term. It was further agreed that the loan would be made upon as liberal terms as the Tabler loan or the terms for the payment of the purchase price. After this agreement was made, Mr. Roddy directed his son-in-law, Mr. Ralph Cate, an attorney at the Knoxville bar, and also a real estate agent of years of experience, to prepare the papers, or mortgage, and to examine the abstract, but he said the mortgagors would pay the expense. Mr. Cate was furnished with an abstract of title prepared by another lawyer of Knoxville, and he asked Mr. Roddy if he was satisfied with this abstract, or should he (Cate) make an independent investigation of the title, when he was told that the abstract was satisfactory. Mr. Cate then prepared the papers, and he testified that he prepared them as best he could to express the real intention of the parties. At the time there was a discussion going on in his office between the parties in reference to the terms of this covenant, but he cannot recall what was said.

The Tabler deed from which he must have taken his calls for the mortgage also contained the covenant for the partial release of lots when sold, but it was graduated according to the value of the land, i. e., the woodland was placed at one price, while the other land was fixed at another price, and there was an exception of the house and 10 acres around it. Undertaking, as he says, to draw the contract as intended by the parties, he inserted this covenant in the mortgage:

"It is contemplated that the first parties may subdivide the property above described into lots or sell small tracts of the same from time to time, and it is accordingly agreed that the holder of the indebtedness hereby secured will release the lien created by this instrument as to such lots or tracts as may be sold, upon the payment to the holder of said indebtedness of an amount or amounts equivalent to and based upon a valuation of $200 per acre—said payment thus received by the holder of said indebtedness to be applied upon the indebtedness hereby secured."

The mortgagors were vitally interested in this covenant and wanted it without restriction; the mortgagee thought that he was protected notwithstanding the covenant as written, for he testified: "I gave that no particular concern; I worked on the principle that Charles was going to take care of my note, and it was immaterial to me."

In addition to this security Mr. Roddy's note was indorsed by Mr.

J. J. Galbraith as personal security. It was thought and agreed at the time that any acre of the land was worth $200 or more, and, if part of the land was sold off in lots, the balance would be ample security for the unpaid debt. This fact is illustrated by the following question and answer:

"Q. Now you first talked to them about making a release clause of $125 an acre, didn't you?

"A. Immaterial what the release clause was, because I was working on the theory he was going to pay my note."

He did not contemplate the insolvency of these real estate operators and their personal security, and he admits he was relying upon their ability to pay and treated the release as immaterial. He was in no position to say he did not understand the covenant and was misled by its terms. We think the facts show that he understandingly agreed without reservation to release any lots or parcels sold upon the payment to him of $200 per acre, and at the time this worked no hardship, for the responsibility of the parties and the value of the land then amply justified the undertaking. He understood that these lots were to be sold at a profit, or at more than $200 per acre, and, if they had immediately sold this 3-acre lot upon which the house was located at a price of $3,000, the value he claims the property to be worth, he would have then released it, since he had contracted to only demand the payment upon his debt the specified sum of $200 for each acre sold. This contract at the time of its execution worked no hardship upon him, but amply secured him, and is not an inequitable agreement the court will decline to enforce.

If this covenant be valid, then the acceptance of the deed by the grantee, or mortgagee, operates as an estoppel to refuse to perform the stipulations therein made. Moore v. Stovall, 2 Lea, 543, 557; Rosenplanter v. Toof, 99 Tenn., 92, 41 S. W., 336. Under these circumstances, the court will not repel the complainant upon the theory that his hands are unclean when he comes into court insisting upon the declaration of his rights under the contract. He has done nothing but what he thought he had a legal right to do. The fact that the defendant has entered into a contract that may work a hardship upon him will not justify the court in reforming it and making a new contract for him by confronting the one who seeks to take advantage of the contract with the maxim that "he who comes into equity must come in with clean hands;" if this were the law, many mortgagees would find themselves embarrassed in the foreclosure of their liens in these days of depression.

This court is asked to construe this covenant as unenforceable because too indefinite. Like covenants for a partial release of the liens have been upheld as valid by the courts in a long list of opinions which appear from the note under section 999 in the title "Mort-

gages,'' 41 C. J., p. 826. But we have been unable to determine if more than two of these cases treat of the question of the indefiniteness of the covenant. One of the cases, which we will discuss, holds that the covenant is too indefinite, while the other case holds that a covenant somewhat similar is not void because indefinite.

In the first case, McCormick v. Parsons, 195 Mo., 91, 92 S. W., 1162, the covenant reads as follows:

"And for every $600 that is paid on said notes said parties of the third part obligate themselves to release one acre of the tract hereby conveyed from the lien of this deed of trust."

The court held as follows:

"That this description of 'one acre of the tract' to be released on the payment of $600, was insufficient to identify the acre to be released, and that part of the deed of trust was void for uncertainty. So that, a payment by the mortgagee of $9,500 on the debt, and a demand, after foreclosure but before the trustee's deed was made to the purchasing mortgagor, that he and the trustee release from the operation of said deed of trust 15⅚ acres off of the east side of said thirty-nine-acre tract, cannot be specifically performed, for the validity of the release clause depends entirely upon the sufficiency of the description of any one acre of the 39, which description is wholly insufficient."

In the second case, Sacramento Suburban Fruit Lands Co. v. Whaley, 50 Cal. App., 125, 194 P., 1054, the court, passing upon this covenant, said:

"Said mortgagee shall release any ten-acre lot or more from the lien of this mortgage upon the payment by the said mortgagor to the mortgagee of one hundred and twenty-five ($125.00) per acre for each acre so to be released."

And, distinguishing this case from the Missouri case, said:

"The above case is the nearest approach to the appellant's position here of any other to which our attention has been called. The conclusion reached therein is expressly based upon the rule applicable to cases of conveyances of real property heretofore referred to. There is, however, a distinction which, we think, is substantial or does not involve a mere refinement in logic between the release clause in McCormick v. Parsons and the release clause in this case. It will be noted that in the former case the clause reads 'For every $600 paid one acre of the tract conveyed shall be released,' etc., whereas, the clause in this case is that the release shall be upon 'any 10-acre lot or more . . . upon the payment,' etc. In other words, while in McCormick v. Parsons the mortgage provides for the release upon some one acre of the tract, in the present case the provision is for the release of any 10-acre lot or more, which, as that language clearly implies, may be selected by the mortgagor himself, and that such was

the intention of the parties is plainly evidenced by the fact that there is no provision in the release clause or anywhere in the mortgage for the platting or subdivision of the tract into lots of any size or dimensions.''

We are asked to follow the Missouri case and hold this covenant under consideration void for uncertainty. The basis of the holding in the Missouri case was that the covenant was void because it violated the statute of frauds, and the description could not be made certain by parol evidence. In other words, the one acre was not definitely cut out of the boundary, and therefore the provision was uncertain and indefinite. This reasoning is not followed by our court, since the original tract was described, under our holding, the owner of the undescribed lesser tract would take and the owners of the two parcels would become tenants in common. Brown v. Maury, 85 Tenn., 358, 3 S. W., 175.

But we do not think the Brown v. Maury Case is controlling in this case or that the covenant before us is so indefinite that the purchasers of the lot by deed will take as tenants in common with the mortgagee. We are of the opinion that the covenant before us does not violate our statute of frauds (Code 1932, section 7831), and therefore it is not void because uncertain or indefinite. The covenant before us is analogous to written authority given an agent by the owner to lease or sell land, and in such case the writing is important only to establish the agency, for the statute of fraud does not require the agent's authority to be reduced to writing. And, since the mortgagors exercised this right given them under the covenant by a formal transfer of the title by deed, definitely describing the land conveyed, the mortgagee is estopped to deny the mortgagors' authority to do so.

''The authority of an agent to sell land and to execute a written contract of sale, or to execute a bond binding the principal and owner to convey the land need not be in writing.'' Shannon's Ann. Code, sec. 3142, note 144; Farris v. Martin, 10 Humph., 495; Matherson v. Davis, 2 Cold., 443; Davis v. Tisdale, 4 Yerg., 173.

''Where the authority to lease or sell land is in writing, the writing need not be a formal document. An ordinary letter of general authority is sufficient, even though it does not specifically describe the land.'' Shannon's Ann. Code, sec. 3142, note 144.

The covenant is not void for uncertainty. There are other assignments of doubtful merit that we have not discussed, for the issues were not raised by the pleadings, and they call for no further discussion.

The decree of the lower court is affirmed, with costs.

Ailor and McAmis, JJ., concur.